Hear ye, hear ye, hear ye. The United States Court of Appeals for the 11th Circuit is now open according to law. God save the United States and this honorable court. Good morning. This is Judge Wilson in Tampa. Judge Lagoa is in Miami. And Judge Anderson is in Macon. And before we begin, I would like to thank counsel for your cooperation in accommodating this oral argument by teleconference and for your cooperation with Mr. Barrera from the circuit executive's office, Ms. Nuremberg from the clerk's office, and Mr. Robinson who is here and he is the courtroom deputy. Mr. Robinson is the timekeeper and he will advise counsel when the red light is on and when the yellow light is on. I will advise counsel that we are ready to proceed. The panel has not previously conferred about this case, but we have read the briefs and we've examined relevant parts of the record. If that will assist you in confining your arguments. We have one appeal that is scheduled for oral argument this morning. And it is National Mining Association versus the Department of Labor. United Steel is an intervener and the United Mine Workers of America is an intervener as well. Mr. Moore, R. Henry Moore is here for National Mining, the petitioner. Susan J. Eckert is an attorney for interveners and Emily Toler Scott is here for the Department of Labor and the Mine Safety and Health Administration. It appears as if we are ready to proceed. Mr. Moore, are you ready to begin with your argument? Yes, I am, your honor. You may proceed then. Thank you. May it please the court, I'm R. Henry Moore. I represent National Mining Association, the Portland Cement Association, American Iron and Steel Institute, the National Stone, Sand, and Gravel Association, the Georgia Mining Association, and the Georgia Aggregates Association. You can speak a little louder, please. I will try, your honor. I am using the handset and I have it turned up as loud as I can get it. But I apologize if I'm a little bit hard to hear. The rule that is in front of you was published just after the inauguration of the current president and it had been preceded by a number of policy documents that was somewhat controversial. It was challenged by the trade associations I represent and in August 2017, MSHA said they were going to consider revising the rule that they had put out. They allowed it to go in briefly into effect in October 2017. And in April 2018, they published another revised rule and changing the timing of a workplace examinations in the recording but no other issues. That rule was challenged by the unions and thrown out by the DC circuit in June of 2019. Frankly, both the 2017 rulemaking and the 2018 rulemaking were seriously flawed and the court should essentially tell the agency to start over if they want to change the rule. The rule that had been in effect up until October 2017 was a rule that was promulgated in 1979 and had been in place throughout that time. Also, we should all bear in mind that while this is a rule that applies to workplace examinations, there are other rules in Part 56 and Part 57 of 30 CFR that identify other types of examinations such as for equipment, for ground control, and the like. It wasn't the rule geared to improve the reduction of fatalities in metal and non-metal mines after a finding that 122 fatalities occurred from 2010 to 2015 and that at least 18 of those fatalities occurred in cases where the operator knew or should have known of the hazard but failed to take prompt corrective action. Fatality reports, which covers 18 fatalities that they relied on, they don't frankly indicate that the 1977 rule was defective in any way. May I ask you a question, Mr. Moore? With respect to that final rule, the final rule gave the justification for the 16 accidents. There were 18 fatalities and out of those 16 were if the person had been alerted to, they could have done corrective action. But isn't in the record, don't the facts actually show that there was actually only three individuals or three fatalities that would have been affected by the rule change? I'm not even sure there were three, Your Honor, because in all of the 16 reports, they say the operator knew of the condition. And I don't even think that there are three that justify it. When I was looking at it, I did not see three that would have been fixed by a rule such as this. I did see one that jumped out at me when I was looking at it. There's one that's on, I believe, on page 325 of the appendix that was a situation where a piece of a tractor truck had been lifted off the ground with a chain hoist and hadn't been blocked and it fell. What struck me about that is one of the arguments we have is the timing argument. And if I walked in and at the beginning of the shift, I would not expect that truck to be above the floor. But that would be something that would occur during the work process. It would not have been something that was identified if it were, in fact, on the floor. And that's not clear from the report before they started working on it. That's not something that would have been addressed by this rule. We have said that there is a threshold. Leaving aside the standard, it has to be the product of reasoned rulemaking. We have said there's a threshold both in the Act and based on the Supreme Court decision in American Petroleum that said that you've got to have a justify changing the rule. That decision was confined to an examination of a different Act, the Occupational Safety and Health Administration Act, which is a materially different statute. So the findings that are required by the Mine Act are not the same as the findings that are required by the OSHA Act, are they? Actually, we believe they are because while what the court looked at in American Petroleum is the OSHA Act says that the rule has to be reasonably necessary or appropriate to provide a safe workplace. And that's paraphrasing the last part of that. The MSHA, the Mine Safety and Health Act, says it doesn't have the reasonably necessary, but it has appropriate for improved health or safety standards for the protection of life and prevention of injuries. I don't, frankly, I would submit there's really no difference between safe and for the protection of life and the prevention of injuries. This is Judge Anderson talking. It seems to me that assuming some threshold findings are required, it seems to me that the threshold findings in this Act are, number one, that it be an improvement, and number two, that it be appropriate. This statute reads, the Secretary shall develop, promulgate, and revise, as may be appropriate, improved mandatory health and safety standards. It also seems to me that the word revise is significant in that it indicates to me that Congress realized, as evident in several other parts of this statute, that mines are particularly vulnerable to safety and health risks. And, therefore, Congress expected the agency, from time to time, to revise and improve. So, bottom line of my question, it seems to me that whatever findings need to be made are, number one, that whatever is done in changing the rule be an, quote, improvement, and, number two, that it be appropriate. And it seems to me that there are ample findings with respect to all of these. We're talking about the timing right now. If you'd like, I'll go into those. But it seems to me there are ample findings of both improvement and appropriate. Well, Your Honor, I guess to answer your question, I think part and parcel of that threshold finding is a finding that there is a deficiency in the existing rule. If there is an improvement, that may imply some risk, but in a mine where people are necessarily, and obviously as a matter of common experience, vulnerable to risks, if it is an improvement, that means it's going to be better. And I agree it has to be some significance because, especially if the burden were high, you would not want an insignificant change to impose a burden. But it seems to me as a matter of common sense and common experience, if you conduct the workplace exam before the workers start working, the workers, especially the rule that also requires notice, the workers can avoid the hazard. And it's just a matter of common sense that that will be an improvement, it seems to me. What's wrong with my thinking? Well, I think the problem is that oftentimes the, quote, hazard doesn't exist until the work starts. The truck fatality that I mentioned is a classic case. Sure, sure. But that's true whenever the exam occurs. If it occurs in the middle of the shift, the same thing is true. And the agency responded to that comment, which was a good comment, a reasonable comment, but they responded that this is the best we can do. It'll safeguard or tend to safeguard workers from hazards that exist at the beginning, and then the workers and the foreman are to constantly be on the lookout. Whenever you have your exam, there's the possibility of something happening after. Well, the previous rule, which didn't tie it to the particular time, was gave what, in our view, in the view of the commenters, gave flexibility in determining when was the appropriate time to do it. Let me point out, this is not really addressed in the rule in the 2017 rule, but oftentimes shifts are 12 hours long in the metal-nonmetal industry. And if I knew that someone was going to three or four places in one of these large plants that they have, and I said, okay, I'm going to go visit those now at the beginning of the shift and see what's there. Okay. May I ask a question, though, before the time expires? Yes. My understanding of the pre-rule and then the current rule is that under the current rule, the examination only takes place before the shift, before the miners begin working. And then in the original or in the older version, it could have been at different points during the shift. That is correct. Okay. You could, depending on what work was being done and what conditions were being created during the shift, you could do an exam later in the shift rather than before work began. If there are no other questions, I've saved some time for rebuttal. I will stop now. All right. Thank you, Counsel. And so we'll now hear from Ms. Eckert. Thank you, Your Honor. Good morning. May it please the Court. My name is Susan Eckert, and I'm Counsel for the United Steelworkers. And with me is Laura Carr for the United Mine Workers. And I'm going to be presenting for five minutes today on behalf of both unions. The unions assert that the 27 workplace examination rules should be upheld as consistent with the Mine Act statutory purpose in Section 101A. The record demonstrates an overwhelming need for improvement in the workplace examination standards and shows that M should engage in reasonable decision-making, developing a common-sense rule to improve safety. At one point I'd like to make right off the bat to address the judge's concern, is the rule does change the timing to require the exam before the workers go into an area, but there's nothing stopping a good mine operator who knows that conditions are developing over time to continue to have additional workplace exams throughout the day. And, in fact, that's encouraged and that's a good practice. The main important point is that it requires a bright-line test, that before workers go into an area, the miners will not start working unless the area has been subject to this workplace examination rule. In addition, we'd like to focus on two main points. This is Judge Anderson interrupting. I'd like to ask this question. Is there any provision in the agency rules or procedures whereby a particular mine with respect to a particular workplace where hazards have been found to arise at a particular point in the shift, is there any procedure whereby they can have an exemption and have the workplace exam occur at that different, more appropriate time? I believe your question is can a particular mine operator seek an exemption from the workplace examination standard? That's the gist of my question. You're correct. Okay. I don't believe that that's the normal practice, and maybe Ms. Scott can address that in more detail. My understanding is that this rule, in general, would apply to all mines and whether they could seek some sort of alternative, I'm just not sure. With regard to the case that we were involved in, the United Steelworkers v. AMSHA, we believe that decision supports AMSHA's determination and shows that AMSHA reached conclusions based off of evidence-based fact-finding that support the benefits of the 2017 rule, and we're hoping to highlight some of those for you. In that D.C. Circuit decision, the D.C. Circuit rejected AMSHA's attempt to add flexibility back into the timing of the workplace examination rule in the manner that the D.C. Circuit found was less protective, and that would parallel returning us to the 1979 rule. And again, I want to reiterate, this does not mean that a mine operator can't do more and conduct further examinations, but it does address a real problem that the agency found, that when a person, when there is flexibility and variability added into the process, they were getting too many accidents because there were unacceptable fatalities and injuries that were increased as a result of the timing of the workplace exam. So the D.C. Circuit found that increased flexibility as to the timing of the workplace exam does not improve miner safety. I think that lends support to AMSHA's rule requiring those exams before workers go into an area. Do you have a cite to that case? I do, sir. It is United Circuits v. AMSHA 925, Fed 3rd, 1279, D.C. Circuit, 2019. Thank you. Yes, and that case put the 2017 rule into effect, and that does govern now and does protect our miners. In addition as to the enhanced recordkeeping provisions, the D.C. Circuit also relied upon findings that AMSHA made that requiring mine operators to record all adverse conditions, including those that are immediately corrected, helps expedite the correction of these conditions and identifies trends and areas or subjects that may benefit from increased safety emphasis. And I believe that the D.C. Circuit's examination of these two provisions helped support the fact that AMSHA was engaged in reasonable decision-making with the 2017 rule. And some of the most impactful items that AMSHA considered in the rule- I'll speak on page five. Okay. Thank you, sir. I'm sorry, but in the- let me just ask this one question. In that case, though, didn't they vacate the 2018 amendment and reinstate the 2017 standard? Correct. That's what happened there. Okay. They vacated the change and brought it back to the 2017 rule, and now they're looking to bring the- mine companies would like to return to the old rule, the 1979 rule. Okay. Thank you. Thank you, Ms. Eckert. Thank you. We'll hear now from Ms. Scott on behalf of the respondents. Thank you, Your Honor. And may it please the Court, Emily Tiller-Scott for the Department of Labor and for AMSHA. I'll begin quickly by addressing your question, Judge Anderson, about whether there is a process for a mine to get an exemption from a standard. It's not quite an exemption process, but Section 101C of the Mine Act, which is 30 U.S. Code 811C, under that section, either a mine operator or a representative of miners at a particular mine may petition the Secretary of Labor for a modification of that standard. Those are called petitions for modification in industry parlance. And essentially, they ask the Secretary of Labor, based on the particular conditions at this mine, we think either the standard as it applies to us is unsafe or that we have a better, safer method. And there's a procedure under the Secretary's regulations at that point that moves that petition forward for the Secretary to make a determination about whether, based on the conditions at a particular mine, it would be safer to take a different approach. So that's a long answer to your question, Your Honor, but the short answer is yes. Thank you. Ms. Scott, let me ask you this question. Let's assume that you have to comply with the threshold findings that are set forth in the American Petroleum case. What can you tell us to convince us that the existing standards or the standards before rulemaking were inadequate or insufficient to protect miners if those standards were enforced? Because it seems like where there were accidents, it's because the mines failed to comply with the existing standards, not necessarily necessitating new revised standards. I have a couple points in response, Judge Wilson. First is, as we explained in our brief, the fact that the mine operator may not have complied with the existing standard is itself indicative, or at least could be indicative, of the need for an improved standard because it indicates that those standards either don't have sufficient compliance incentives or don't have sufficient enforcement mechanisms to induce compliance with those standards. Additionally, I will note that... But may I ask a question just following up on that answer? But this change, how does this change in any way protect the miners any further? Because it doesn't create any incentives or any penalties. I mean, what is the difference between the old rule and the current rule in terms of protecting the miners from potential accidents? Well, in addition to... I think there are three central provisions. One is the timing, which I think has been the subject of the most discussion. But the other two, and these are crucial as well... But the timing is not... That's not necessarily been answered for me because there isn't anything in the record that shows that these accidents actually occurred as a result of something happening pre-shift starting. Even if the timing and isolation didn't prove that, I think the other two provisions, the notification provision and the record-keeping provision, do. And MSHA made these findings clearly. MSHA claims that the notification... Okay, but the record and the note-keeping, that was already existed. That already existed in the old rule, correct? That's not something new. It is substantially different from what was required, and so I do think it is a significant improvement. The old rule only required a mine operator to keep a record that the examination was done at some point. The new record-keeping provision is much more robust. It requires an explanation of who did the exam, where it was done, when it was done, what adverse conditions were found, and what corrective... and the date of the corrective action that was taken to address those conditions. So those additional record-keeping requirements, MSHA found, will both enable mine operators to identify recurrent hazards, which will help them to prevent those from occurring in the first place, and will also enable miners' representatives, to whom records have to be made available, to do the same thing. So those things are significant improvements addressing a deficiency that existed in the existing rule. The notification provision, too, is new. This was not in the old rule, and the notification provision is crucial for a common-sense reason, as Judge Anderson was alluding to, which is that if miners have to be told about safety and health hazards that may exist in a working area, then they'll be able to take measures to protect themselves against those hazards, and that, I think, as MSHA explained, and is a matter of common sense, is a significant safety and health improvement. In addition, the notice... this is Judge Anderson speaking. In addition, the notice to the miners and the fact that the records are open to the miners' representative will obviously tend to improve compliance, because if the miners know about hazards that are not corrected, that will certainly be an incentive to the operator to correct hazards promptly. Yes, I agree. And the agency expressly so found. Yes, thank you, Judge Anderson. I agree with all of those points, and I will also note that, you know, this is... I know that the operators expressed some concern about whether this provision will be a GOSTRA provision. It is not. This is really about enabling everyone at the mine to identify problems that may be recurring and to fix any problems that are there before they're going to hurt someone. I will also just note that the standard, as a technical matter, does not require operators to immediately fix everything. Some things can't be immediately fixed, but it does require operators to notify miners about anything that can't be immediately corrected and to promptly initiate action to fix those things. What would happen at the beginning of the workday if, because of the weather or lack of daylight, it's impossible to conduct a workplace examination at the beginning of the shift, and the final rule requires that a competent person conduct an examination before work begins? What would happen there? In that situation... I apologize, Your Honor. Go ahead. Well, in that situation, then, work would not be able to begin until the workplace examination had been conducted. I know that, and perhaps this gets back to the issue of whether before work begins was the best solution to the problem of timing. MSHA does acknowledge in the final rule significant comments that were received from mines who operate in this way or similar to that. MSHA explained that this was a concern and that MSHA understood. However, MSHA ultimately made the determination that given the really wide variability of operations at metal and non-metal mines all across the nation, that the best choice, the most minor protective choice, and feasible choice for operators was to require the examination before work begins. Those may be... I mean, certainly those are possibilities, but I think MSHA... There was no comment, at least to my knowledge, that those were the vast majority of cases. Instead, the before work begins timing requirement gives operators a significant amount of flexibility to make that work for them. So in mines where there are multiple shifts around the clock, the examination can be done at the end of the prior shift as long as, again, it's reasonably close in time so that operators would not anticipate that conditions have changed. This is Judge Anderson. Let me ask you this question. What do you think, or do you not think, that there is a requirement in the statute that there be findings indicating that the revision does, quote, improve and, secondly, that it is appropriate? Does not the... That's a little bit different requirement than American Petroleum found in that statute, but does not this statute require that? I do agree, yes, that Section 101A requires standards to be both appropriate and improved, and I think both of those things were met here. I mean, as our brief indicates, the difference between the Mine Act and the OSHA Act is both a linguistic one, the language in the statute, but also significantly an industry one. The OSHA Act applies to basically all non-mines in this country, and that is a much wider swath of industry to be regulated, but as, again, we explained in our brief, even to the extent that some threshold finding of unsafeness is required, Congress made it. Congress found that mining is unsafe, that unsafe and unhealthful practices exist, and that they need to be corrected. Now, I understand that petitioners submit that mining is less deadly now than it was in 1977. I think the numbers bear that out, but less deadly does not mean perfectly safe, and MSHA is eminently reasonable, I think, in erring on this side of safety here to the extent that there was any error at all. It was simply by reviewing over 120 fatalities over five years, I think that is an eminently reasonable basis for MSHA to find that there was both an improvement that could be made and that was appropriate, and this standard satisfies both of those problems. Absolutely. Okay, let me ask you this question. I'm looking at volume 82 of the federal regulations, page 7689, and it seems like the agency is admitting that it, and I'm quoting, is unable to separate the benefits of the new requirements under the final rule from those benefits attributable to conducting a workplace examination under the existing standards, close quote. So it seems like the agency cannot say that the existing standards can be improved for the protection of life and prevention of injuries. I understand that that is one sentence from the economic analysis. I would direct your honor to the Joint Appendix, page 3. This is the Federal Register 7682. There MSHA did find that the benefit here, while maybe not quantifiable, will be improved accident prevention. I agree that MSHA did not quantify this benefit. MSHA, however, is not required to. And, you know, one of the difficulties that MSHA faces or faced in this rulemaking is that because so few records were required under the existing rule, there really was very little data for MSHA to be able to rely on. So I don't think, or I think it would put the agency in a pretty significant catch-22 to tell the agency, well, data is not required to be kept, therefore you have no data, therefore you're not allowed to regulate, which to me is sort of the thrust of the petitioner's argument on this point. But don't you, since you regulate the mining companies, can't you then ask them for the data? Can't you collect? I mean, the agency is not without the appropriate tool to be able to collect the data if it wants to. But in the absence of a standard compelling the industry to keep the records in the first place, I'm not sure what MSHA could do in that case. Well, but they could, with regard to the accidents, they could investigate those and they could determine why the accidents occurred and what could be done to prevent the accidents from occurring. Well, MSHA does investigate fatal... I apologize. Well, MSHA does investigate fatal accidents, but there are a great deal more non-fatal accidents that occur in mining as well. I understand that, but isn't the justification for this rule change really the fatality? That's part of the justification, but not all of it. The other justifications were, one, MSHA's experience in this realm, which it did explain that experience, and then also its review of other studies conducted in this area that showed between a 17% and 24% reduction in injury and accident rates. So this wasn't just... I mean, fatalities were part of it, but it was more than that. It was also MSHA's expert review of both the expert literature... Well, but I'm looking at the final rule itself, and that's really the only justification given for the rule change is the fatalities, the 16. Well, perhaps I'm reading this differently, Your Honor, but to me, at the Joint Appendix, Page 3 on 7682, MSHA discusses the studies that I've just alluded to that it also relied on and throughout, you know, emphasizes what its experience was in justifying this rule as well. Significantly at Page 7689, MSHA explains that, you know, working place examinations are done. For example, before this rule, if a shift ended at 4.30 p.m., a mine operator could conduct a workplace examination at 4.29 p.m. and still be in compliance with this rule, and that is really fundamentally one of the significant bases for the timing change, at least, that MSHA made here. All right. And, Ms. Scott, have you completed your argument? Yes, Your Honor. Thank you. Okay. Thank you, Ms. Scott.  Yes, I did, Your Honor. Let me touch on a number of things. First of all, on the petition for modifications, there is that process available. It is painful and protracted, and there are any number of Court of Appeals decisions which demonstrate that, so it's not really a viable or feasible option when you're talking about examinations. Second, when we're talking about the D.C. Circuit case, there are a number of reasons that they gave for rejecting, for example, the change in recordkeeping, that they said you can't credit a justification based on deficient compliance with the existing standard to justify the new rule. So the other second, third thing I would mention is the whole thing of the congressional findings in 1977. There aren't any findings with respect to the 1977 rule, and I think that's what you have to make under American Petroleum. It's not sort of a generalized, the industry is unsafe. There are lots of industries that are unsafe. Mining has done a remarkable job, whether you view it because of regulation or because of their own efforts in bringing us to where we are now. Third, on the notification issue, one of the things that I think we all have to recognize that in many facilities, the people doing the exams are the actual miners who are going to do the work. They are competent people. It doesn't require any special certifications or the like. They are the ones going in. The third thing is it's interesting because there was the question about what data is available. Actually, in most fatality investigations that I've been involved with, MSHA asked for the workplace exams, and this preexisted the 2017 rule. It was standard practice. Let's see what your records of exams say. There are operators who have essentially a card system. They give the employee a card, and they say mark on here any hazards, and it gets thrown in at the end of the shift. There is some data available that could have been examined. Second of all, there is data available if MSHA wished to go there. The data that is available is in the coal industry, which has a different historic regulation scheme, both federally and state, and they include descriptions of the conditions that are found. MSHA, if they wanted to, could go in and draw that comparison. They did not, I assume because they felt that it would not help them because, frankly, there are any number of cases where they've relied on what's in the record books. This is Judge Anderson. You said that the minors themselves often do the workplace exams. Did I understand you to say that? That is correct. If that is true with respect to the burdens imposed on the industry, the only burden that I saw in your brief that seemed to have any significance at all was that the requirement that the timing be before the work begins would mean that you would need to have more people doing the exams if the minors themselves or the foreman of the shift, for example, can do the workplace exam or be readily certified to do that. It seems to me that that alleged burden that I thought that I might have been concerned about is not of concern at all. How do you respond? Your Honor, if the notification was limited to the person actually doing work in the area, that would be one thing. But it's not limited. It's minors in the affected area, and you don't know necessarily who might come to the area later. The lack of clarity, and this is not the only provision that there's a lack of clarity, makes it difficult to figure out how to comply. The industry as a whole wants to comply, but the rule isn't clear enough to do that. Obviously, since 1977, there are portions of the rule that we've said, you've got to clarify this further. Well, since 1977, we all know Chevron happened as well as an increased emphasis on deference to an agency's interpretation where an agency's interpretation is binding on the operator. We can't have the lack of clarity that's in this rule, and we think that what should happen is you should vacate it, let them go back and start over and see if they can create a better rule and justify it better. I believe I'm out of time, so if there are any more questions. Well, I hear no questions. Thank you, counsel. The case was well argued. We'll take the matter under advisement, and the court will be in recess until 9 o'clock tomorrow morning. Thank you. Thank you.